Take your time setting up. Our next case is number 24-10425, the United States v. Matthew Alexander Zayas. Good morning, Your Honors, and may it please the court. Anshu Bhadrani, Assistant Federal Public Defender on behalf of the appellate Matthew Zayas. Mr. Zayas stands convicted of the wrong crime here. While he was charged with violating 31 U.S.C. 5324A1, the government's case and the court's instructions to the jury led to a conviction under subsection A3 of that same statute. Let me ask you this. This case, I think the district court judge correctly summed it up saying that it was messed up. But having said that, I want you to address these things that I'm going to list for you and tell me why they're still a problem. The jury was instructed initially on the right statute, the statute under which he was indicted, right? You say that there was other stuff that made that instruction wrong. It broadened. It broadened by putting in structuring. But the jury was not instructed on A3. It was instructed on A1, right? In part, yes. Not in part. There was no A3 instruction. Our argument is there was because of the addition of structuring, which statutorily is linked only to A3. Okay, but just to the addition of structuring, though, didn't require the jury to find anything. It just defined the term structuring. It defined a term that's not found in any of the elements. That's exactly right, which is why I think it was very odd. But just to go to Judge Jordan's point, the actual things the jury instruction told the jury they had to find were not in A3. They were in A1. Well, so what it allowed them to do was to find something that's incongruent with what they needed to find for A1, which was a transaction that did, in fact, trigger the bank's reporting requirement. But here, there were those transactions. There were the two transactions on the same day, each for $8,000 plus, and those two transactions triggered the bank's duty to report. Did it not? But that's not how the government presented its case. I'm not asking about the government's presentation. We're talking about the evidence in the case. Under your view of the law, and I think my view, too, I think you correctly stated, you can have an A1 offense with transactions that are carried out on the same day that trigger a bank's obligation to file a CTR. You must have that for an A1 offense, I believe. Right. Right. You can have that for an A3 offense to be... What's that? That can be the case on an A3 offense as well. Yeah, so there's overlap between the two in the commission. Yes. Okay. So here, you had two transactions on the same day, each for over $8,000, each or one for A1 for A plus by the same customer, the same individual at two different branches. That triggered the bank's obligation to file a CTR, right? Well, we don't know if it did. You mean you don't know? Well, because... You wanted a bank employee to come in and say, we know that we should have filed a CTR? That's not the way you establish knowledge in A1 cases. It may be when you're proceeding under an aggregation theory, though, because... What does the government need to prove knowledge under an aggregation theory? The aggregation regulation itself requires, it says, multiple transactions shall be treated as a single transaction if the bank has knowledge that they are on... $2,000, $8,000 transactions on the same day at two different bank branches. The minute he carries out the second transaction, the bank's records tell the bank that it has an obligation to file. The bank may have missed the obligation, but it had an obligation to file a CTR. I think what's missing here is that information. We don't know anything about the bank's system or if it did trigger, it was three transactions at three different bank branches with three tellers. It's unclear from this record, because this wasn't the subsection through which the government was proving its case, we don't have that information. We don't have any testimony about it. We just don't know. It was the right way to analyze this case. I think we can, from my perspective, we can start with the presumption that this case is messed up. Is the right way to analyze it that it was an A1 case and the question is whether the government proved an A1 violation? I think that's a way to view it. I think the harm the constructive amendment argument gets at is a little different. It's that if it's possible that the basis of conviction may have been broadened beyond what was alleged in the indictment, that renders this conviction that needs to be vacated. I think Sterone stands for that though. I see the point about, but had the district court sort of saved the government for that by not giving the government's requested jury instructions, right? The government did, in fact, request jury instructions for an A3 offense. This isn't an A1 offense, but the district court said I'm not going to give those because that's the wrong offense. And the jury instructions the district court gave were the elements of an A1 offense. But with the addition of a structuring instruction, which in our argument is that did the basis upon which. I guess my question, look, on that, I don't understand why the district court gave that. I really don't. But it defines a term that is not used in the instructions. So how can we say that the definition of the term that is not otherwise used in the instructions broadens or changes what the jury must find when the instruction says this is what you must find, lists the elements, and then just has this sort of definition of a term that's not used. I guess that's, I don't understand that, I guess. I think it's presence in the instructions. I mean, the instructions overall are meant to instruct the jury on the law. And so if they're being told on the one hand, you need to find a transaction in excess of $10,000. And in order to do that, they need to reference the aggregation instruction that's on a separate page. And then right underneath the elements, they see structuring is the following. And it allows for you to find. But if this case had been tried the way you think it should have been tried, the government could have referred to it, Mr. Zayas did on the same day as structuring. I agree. So what's the problem? The problem is that's a different statutory subsection. No, it's not. If the government tried it under A1, and the allegation is that Mr. Zayas did something to cause the bank not to file a CTR, what he did to cause that was instead of conducting one transaction for $16,000, he conducted two transactions, each for $8,000 or so at different branches. That is structuring. It doesn't mean that structuring is limited to an A3 where the structuring never triggers the bank's obligation to file because it's done on different days. But it's still in the normal sense of the word structuring. And given that structuring wasn't mentioned anywhere else, why isn't that just surplusage in the jury instruction? So two things to say in response to that. It is structuring in like the colloquial way we think of the word structuring, arranging, that sort of way. The problem is structuring in the statute and by regulation has, it's a sort of a term of art and it has, it's a defined term. It was included by Congress to sort of expand the scope of the Bank Secrecy Act and expand the reach of the statute to sort of get at individuals who were conducting transactions in that way in order to sort of stay under the radar. I think at least two of us probably agree with you that that structuring definition comes out of nowhere and probably shouldn't have been given. Right. The question is why it's reversible error. Because that in combination with, so I it's important to remember that a constructive amendment, it can occur through the jury instructions, which I would argue we have here, but also through the government's entire presentation of their case. And if you look at from their indictment, through opening statements, through their colloquies with the judge, through the charge conference, and then at closing, never once do they argue this case as an A1 case. They use the word structuring very frequently, but that's not just the basis of our challenge here. It's that they list the elements for the purpose of evading. You see a lot of evading the reporting requirements, which is an element of both of the offenses. He arranged his transactions. He structured his transactions to remain below the reporting requirement. That's exactly how they argued their case. But that's also relevant to an A1 violation. When you have two transactions on the same day that would have otherwise triggered a CTR obligation, if done at the same time, that's germane to both an A1 and possibly an A3, depending on all sorts of other facts. But it's only germane to an A1 if you also let the jury know that the reason it's germane is because we have an aggregation regulation that allows- But the jury was given an aggregation instruction. They were given that in the instructions, but that's just not how the government, in fact, the government took issue to the court even saying that there had to be a transaction in excess of $10,000 because they were worried that the jury would not understand what that meant because that's not how they presented their case. Yeah, I guess the problem with that, and like I said, it just seems to me, I mean, messed up case. Government confused. But it seems like the district court saved them, though, with this. I mean, they did argue to the district court, give the wrong instruction, and the district court said, like, no, I'm not going to give the wrong instruction. So why would we not look at the actual instructions that were given? I mean, I guess maybe not why, like, aren't we required to look at the actual instructions that were given to the jury and whether there was sufficient evidence to meet that? I think you are required to look at the instructions. They do include something that doesn't belong there, and I think I see I'm over my time. No, you can finish answering. If you look at Sterone, because I think it's easy to conflate maybe constructive amendment and sufficiency of the evidence and say, well, they stumbled their way into sufficient evidence. There was like an almost fully correct jury instruction, but that's not really the relevant inquiry on a constructive amendment issue that there might have been evidence sufficient, that they may have been mostly correctly instructed. That's not the inquiry. Your right to a grand jury indictment is violated whenever the uncharged acts, and this is a quote from Sterone, might have been the basis upon which the trial jury convicted. And I think if you look at the jury question. What uncharged act were there here? A3, though, the way they presented their case, the way that their presentation of the case was, you can find Mr. Zayas guilty if you find a series of three transactions all under $10,000 in an effort to evade the reporting requirement period. They never, ever argued this case as, but the bank caught on, or he made a mistake, and the bank's requirement was, in fact, triggered. That is the element that is required of A1 that's missing from their presentation of this A3 case. Okay. All right. Thank you very much. You've saved your time for rebuttal. Thank you. Mr. Turkin. Good morning, Your Honors. May it please the court. David Turkin on behalf of the United States. I'll just start by responding to what Appellant's counsel was speaking about before, which is the issue of constructive amendments, and it's the government's position there was no constructive amendments in this case. The prosecutor was badly confused about what was, what had been charged, and what needed to be proved throughout the trial, right? I mean, an A1 violation only occurs when there is otherwise an obligation on the part of the bank to file a CTR, and the person accused does something to cause the bank not to file, right? Right, Your Honor. And the government thought that there was no need to tell the jury that the bank otherwise would have had an obligation to file a CTR. The government proceeded as though this were like an A3 type case, where you could have transactions on different days, which by the terms of the law don't require a bank to file a CTR, right, the traditional structuring in legal terms case. Do you think this case was tried like A-OK? Well, Your Honor, I think there admittedly was some confusion regarding the distinctions between the two, I guess, subparts of 53-24. However, I do think that the government did proceed via both argument and presentation of evidence in a way that conformed with and tracked 53-24-A1, not to such a significant degree as perhaps they could have, but I think, number one, sufficient to establish the elements, and number two, to, I guess, to avoid an argument of constructive amendment. Just starting with the opening argument of the government in this case, they framed it as, and I'm just going to quote, the government said that in defining the requirements, they say when a person withdraws cash in excess of $10,000 in one business day, obviously the significance of one business day is more appropriate for an A-1 violation, particularly here where there's aggregation. Counsel, I want to ask you a question about the inclusion of the definition of structuring in the jury instructions. There's a phrase in that definition that I read as inconsistent with what's required under subsection A-1. So that is, structuring happens when someone, and I'm paraphrasing the first part of this, intentionally arranges a series of transactions, each involving under $10,000, in order to evade the currency reporting requirements, and here's the key language, that would have applied if fewer transactions had been made, and of course, under A-1, by contrast, the government's got to show that here, Wells Fargo was required to file a CTR. So given that structuring is really the core element of an A-3 offense, why wasn't the inclusion of that structuring definition in combination with the government's repeated reference to structuring throughout the trial, why wasn't that sufficient to constructively amend the indictment? Your Honor, I think the answer to that question is in part what Your Honors were discussing previously, which is number one, that the court in defining the elements of the offense specifically stated as an element that one of the requirements is that the financial institution in question here was required to file a report. So under no question, the jury was instructed that that was an element of the offense, and this court in considering constructive amendments or an erroneous jury instruction looks to the jury instructions as a whole to determine whether the statements of the law and the elements of the offense are correct, even if a particular section of the jury instruction might be either confusing or not appropriate, and at best, that's what happened here. The elements were clearly set forth here, and to the extent that there might have been any confusion regarding structuring as this court stated in the Leon opinion, which by the way, the same exact instruction regarding structuring was given. Yeah, but so the thing about Leon was one, that was plain error, and two, it made sense there because the district court gave the incorrect elements. So it made sense to give the definition of structuring because this court also gave the incorrect elements. I have a broader question than Judge Geraghty, which is just why is the word structuring defined in these instructions when the word structuring is not used in the instructions? The government requested this definition. The district court sort of questioned whether it should be given, but ultimately gave it. I just don't understand why you would define a term that doesn't otherwise exist in the instructions. Your Honor, again, I'd have to look back at the record. I'm not sure if it was, I can't recall if it was something specifically that the government requested. Well, yeah, the government requested. I think the reason would be perhaps because it was part of the standard instructions given by the 11th Circuit, part of the pattern instructions, albeit as part of the A3 instructions, but there is- The reason may have been the government's confusion that it thought it was trying an A3 case in an A1 indictment. Well, Your Honor, with respect to that- Why it requested an A3 instruction. Well, I think another reason for that might be because other courts, and I'll cite two, it's an out-of-circuit opinion, United States versus Abdelberry. I think the court in that case said that the elements of both A1 and A3 are the three elements that were part of the jury instructions that the government proposed in this case. They're not the same elements. Well, I think as this court set forth in Leon, there are specific elements specifically in light of this court's interpretation of A1 in the FIPS opinion, namely that there be a required CTR opinion and the other additional, I don't know if it's an element, but the notion of aggregation, which also comes into play in this particular case. But as Your Honor previously stated, the district court in this case ultimately rejected the government's proposed opinion, jury instructions, and gave the ones that the defense requested as to the elements. And given that, I think that there is, there isn't a basis to argue a constructive amendment. I think as this court stated in Leon regarding- Your arguments, I think, go to the sufficiency issue, which is the government may have tried the wrong case, but by blind luck, the evidence was sufficient. The district court gave the right jury instructions over the government's objection. So as a sufficiency matter, the evidence was more than enough to convict Mr. Zayas. That doesn't answer the constructive amendment, which is different, which is the government charged an A1 offense and then tried an A3 case. And that in part depends on the jury instructions. The success of Mr. Zayas' variance argument depends in part on the jury instructions. And the fact that they were correctly given here, except for structuring, hurts Mr. Zayas. But my reading of the record, I didn't read every single page of the transcript, but I think I read enough. The government tried or believed it was trying an A3 case from the very beginning. And so you can understand Mr. Zayas' counsel saying, he's charged with A1, and all of a sudden we get to trial and the government's trying an A3 case. That's a variance. So can you respond to that? Yes, your honor. I think I was talking before a bit about what was stated in an opening statement. And I think what the government's counsel said was, and I think just to quote, how will you know that the defendant was trying not to evade the reporting requirements, was trying to not have the bank file a report. And that particular line is more consistent with 5324A1 than A3. No, it's consistent with A3. When you conduct transactions below $10,000 on different days, that's also to not get the bank to file a CTR. It doesn't say that the bank was required to file one. And that's what's missing from the government's presentation. The government didn't know, it seems to me, that it had to prove that the bank would have otherwise been under an obligation to file one. And the government didn't know that aggregation was required to show that the bank would have been required to file a CTR. It opposed an aggregation instruction for God's sake. Well, I would point your honor to the government's presentation of the evidence then where with respect to the reporting requirements, the government did elicit testimony from witnesses from Wells Fargo regarding the reporting requirement and specifically asked one of the Wells Fargo witnesses about aggregation and said, does it have to be in one business day and can multiple transactions be counted together for the purposes of the reporting requirement? And the witness said, yes. So there was in fact a presentation of evidence regarding aggregation, which wouldn't even be necessary at all if the government were in fact proceeding under A3. The reason why they brought in that particular evidence is because they were proceeding on an aggregation theory to show that the reporting requirement was in fact triggered, which is why they elicited testimony regarding that requirement to begin with. Now, I agree with your honor that that particular component, that the nuances of the distinction between A3 and A1 weren't discussed at length during the presentation of the case. And I think that that might just be that the focus of the trial presentation, which included other charges and had less to do with that specific issue. I mean, I guess the thing, to give the government some credit here, I mean, I don't think the defendant was really arguing about this, that somehow the government hadn't proven that Wells Fargo had an obligation to report or something like that. That just didn't seem like that was really an issue in the trial at all. It'd be an odd thing to focus on in closing argument when the defendant was more or less just conceding that Wells Fargo had an obligation to report. And that's correct, your honor. And that's kind of what I was getting at. I'm looking at the arguments that were made during closing arguments for example, the defense's position was, well, this defendant didn't do anything wrong, that this was a misunderstanding. He just thought money just so happened to have magically appeared in his account and he was withdrawing it. So there wasn't really a defense structured around the idea, not to pun structure, unintentional, but it wasn't around, well, was it triggered or was it not triggered? So naturally a government's presentation of its evidence and argument are gonna follow what really the disputed issues are in a particular case. Here, that really wasn't the issue at play. And at the end of the day, for this particular fact pattern, the difference between an A1 violation and an A3 violation, as your honor pointed out previously, is not that great. It can still involve arranging transactions under the $10,000 threshold to avoid the requirement. The difference here is simply whether the requirement, reporting requirement was triggered. And as that was not really a disputed issue during the trial, I guess it wouldn't be as reasonable to expect the government to spend a lot of time dwelling on that particular point above and beyond presenting testimony from Wells Fargo about aggregation so that the jury can understand that two transactions that together in one business day add up to over $10,000 does in fact trigger the requirement. That's what the government presented. And I believe that was sufficient to address the sufficiency argument, as well as the constructive amendment argument to the extent that the argument by the defendant in this case is that the government wasn't putting forth evidence towards an A1 violation. How do you prove the bank's knowledge for an A1 violation? Is it general knowledge of the obligation to file when there are transactions that are aggregated that get you over the $10,000 threshold? Or is it knowledge to the specific transactions at issue that are being tried? Well, your honor, I would defer to the aggregation instruction itself, which is just to have it in front of me, that multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totaling more than $10,000 during any one business day. But then the bank employee who testified for the government hadn't reviewed the documents involved with Mr. Zayas' transactions in this case. So he or she couldn't testify about knowledge on behalf of the bank about Mr. Zayas. So do you, does knowledge have to be presented through a witness or just the fact that the transactions occurred? I'm trying to figure out how you prove knowledge to aggregate. Well, I think in knowledge, knowledge at least, I mean, again, I'm not aware of any case law or legal authority providing a particular directive as to what knowledge in this capacity would be because we're not talking about knowledge of a particular individual, but of a financial institution. That being said, knowledge, I think, could be established as was here through the fact that this is information that the bank had that it had access to and that was within their systems. And that's the evidence that was presented. I remember seeing something about a witness called Justin Kirk who testified that because of these transactions, he tried to contact the defendant and couldn't do so. I mean, would that be the kind of evidence that would suggest knowledge on the part of the bank that there was an employee there that was like, I'm seeing these transactions, there's something going on here that is problematic. I'm trying to contact the account holder.  And in fact, I think that there's a number of different ways that knowledge was established here. Was Mr. Kirk a bank employee? Yes, I believe he testified that he was a financial investigator or a fraud investigator with Wells Fargo. But as far as and just to address your Honor's question with him, yes, and I think the timing of actually his involvement in this particular investigation shows that the bank did in fact have knowledge because the way the evidence played out and I think a number of witnesses testified to this is that at some point in time, I believe it was January 4th of 2019, which was approximately if not 15 days after the December 20th transactions at Aggregate, Wells Fargo closed the defendant's accounts. And in fact, I think it's Government's Exhibit 7. It shows that the accounts were closed and testimony was elicited that this was pursuant to a Wells Fargo investigation. So within 15 days, which I believe is a CTR reporting period, the bank had enough knowledge to close the transactions. And then Mr. Kirk, who your Honor's referring to, indicated that part of his responsibilities involved reviewing transactions and account. And in this case, he actually pulled some of the surveillance stills that were introduced as evidence. And he indicated that he contacted the defendant. And I think one of the questions that was asked of him was, well, was this before Wells Fargo closed the account? And if I'm not mistaken, I believe he said it was. So that would indicate that, in fact, at a minimum, he and Wells Fargo, because they closed the account, had knowledge in addition to the exhibits that he introduced. And I know I'm over time. Exhibits 8, A, B, and C, which were screenshot stills from Wells Fargo's own internal database mainframe transaction system that reflect all the transactions, the fact that the defendant conducted those transactions, and what forms of identification. So given all of that, there was more than sufficient evidence to show that the government had knowledge, however one looks at it. Though this court will often look at not just what a person knows, but what information they're privy to in determining knowledge in other contexts. I don't see why it wouldn't apply that way here. All right. Thank you very much. Thank you. So I want to start by addressing sort of one of the government's contentions, which is that there's a lot of overlap between A1 and A3. And I do agree that they do overlap, and they could potentially cover similar conduct. The problem is A1 is much narrower than A3, and it requires additional elements of proof that A3 does not require. And that's where the government gets into a problem here, because it tried an A3 case, which is basically with the intent to evade reporting requirements that the defendant structured his transactions. And you see how they open, they say the way the defendant made the withdrawals in this case is by structuring. It's all about how the transactions were arranged, and how he stayed below the $10,000 reporting threshold. What doesn't exist in the government's case as it was tried to the jury is any mention of the bank's reporting requirement actually being triggered, which is an element of an A1 offense. And I think it's important also to remember that a constructive amendment issue, when preserved as it was here, it's not subject to harmless error review because the nature of the harm is so grievous and so grave. It's such a violation of a Fifth Amendment right to be tried only on what the grand jury has found. That if the error exists, it doesn't matter that there's, you know, that somehow surreptitiously they were able to find their way to evidence that supports an A1 violation. It is separate from sufficiency arguments. It stands on its own. And in this case, the government ever argue that the bank was relieved of its obligation to file a CTR because of the way Mr. Zayas conducted his transactions? I believe so. They're closing. I think they're closing is actually the most telling of their constructive amendment here because it comes after the motions arguments and the charge conference where it becomes clear that their conception of their case is incorrect. And in closing, they still say he structured his transactions in the best way you would do it to avoid the $10,000 reporting requirement. He did it as close as he could. So far, that applies to both A1 and A3. He says, and making it more likely that the bank would have seen what was going on, the presumption being the bank didn't see what was going on because of how he structured his transactions. There's just never an affirmative. They never talk about aggregation. They never talk about he made two withdrawals. He messed up. They aggregate. The bank's requirement was in fact triggered. Every sentence of their closing relates to the fact that he did it in the best way you would do it to remain under $10,000. It meets the elements of A3, but it's missing a very critical element of an A1 prosecution. And so this all comes down to the variance argument and the sufficiency argument. Does it all come down to whether or not the government messed up with regards to the bank's duty to file? I think that the constructive amendment argument encompasses that, but it encompasses the government's entire presentation of their evidence, of their witnesses, of their case. The underlying facts are the same. That's the part that I'm conceptually trying to grasp with the argument. So in an easy variance case, the government alleges facts A, B, and C, and then proves facts A, part of B, E, F, G, and all the way through. And you're like, what? What sort of a trial am I facing here? Here, the underlying facts, you're saying that some evidence was not very clear, but the underlying historical facts would have been the same for an A1 and for an A3. And that's because he had a transaction on the 19th for $8,000, and then he had two on the 20th for $8,000 or so. And certainly evidence of all three of them was relevant to either to both A1 and to A3. So the underlying historical facts would not have changed. So where I will disagree with that is on appeal, taking a bird's eye view, understanding what the issue is, the facts that were presented have sort of taken on a new art. They're being argued very differently on appeal. Sure, the government is viewing them in the light most favorable that it can to try to save a conviction. So the testimony they rely on, there's one witness who gets close to talking about aggregation, but it doesn't get there because it's just not what the government contemplated was the theory of their prosecution. And she talks about typically how reporting requirements work. And she says, typically, our system will pop up and notify that a transaction over $10,000 for the same business day was processed, even if at a different bank. And then she's asked, so does the more than 10,000 reporting requirement, is it irrespective of how many transactions happen in one business day? That's correct. That doesn't say, as the government argues in their brief, that two separate transactions under $10,000 will trigger the bank's reporting requirement because we'll add them together. All it says is- What does it say? If there's multiple $10,000 transactions that occur in a day, a CTR needs to be filed for each one. It's just, it's not clear. And the reason it's not clear is because that is not the theory under which the government was traveling. So they can look at it now and say, now, yeah, we presented evidence of an A1 case, but they didn't. They didn't. And if you look at their closing, it is the clearest evidence that they did not understand the distinction between A1 and A3. And the error here, it's not one that's, it's subject to harmless error review. It doesn't matter that there was sufficient evidence. It doesn't matter that now they can get up and say, there were two transactions. Even if you look at how they charged to this case, the first transaction, it's irrelevant really to an A1 prosecution. It's not a different day. It shows state of mind. No, it shows state of mind. Perhaps, but more relevant to- You have to do it with an intent to cause. So the prior transaction may not be legally required, but it's certainly legally relevant. And I think even- Can I ask you one more question and then we've taken you over your time. Has Mr. Zayas finished serving his term of imprisonment? He has. He's on supervisory. He's on supervisory. Okay. Yes. So I know I'm over my time. Just ask that you find that the government did in fact constructively amend the indictment here and reverse his conviction. Okay. Thank you. Thank you very much. Thank you, Mr. Turkin.